### IN THE

# SUPREME COURT OF THE STATE OF GEORGIA,

# AT GAINESVILLE,

## SEPTEMBER TERM, 1855.

Present—JOSEPH H. LUMPKIN, ⎫
EBENEZER STARNES, ⎬ *Judges.*
HENRY L. BENNING. ⎭

---

No. 1.—HENRY BOWIE, plaintiff in error, *vs.* THE STATE OF GEORGIA.

[1.] Matters not affecting the real merits of an indictment, are not sufficient to arrest the judgment on the indictment.

[2.] The ground for the granting of a new trial ought, in general, to be something *dehors* the record.

[3.] A motion for a new trial, was made on the following ground, among others, viz : that the Court charged the *triors*, that if the Juror had formed and expressed an opinion from rumor, he was incompetent. In the *motion*, it was assumed that the Court had made this charge; but in the *bill of exceptions*, there is nothing to show that the Court had made any charge at all to the triors; nor anything to show whether it was at the instance of the accused or of the State, that the Juror was put upon the triors : *Held*, that this ground is one on which a *reviewing* Court would not be authorized to grant a new trial.

[4.] The mere omission, by the Court, to charge the Jury on a point, is not, in general, a ground on which a new trial may be demanded. The point

ought, at least, to be such that the law on it is somewhat doubtful or abstruse.

[5.] When the weight of evidence is on the side of the verdict, a new trial will not be granted.

Murder, in Dade Superior Court. Tried before Judge TRIPPE, November Term, 1855.

A motion was made in arrest of judgment in this case, upon the following grounds:

1st. That no such Grand Jurors as William Hale, Soderick Hale and Stephen Austin, appeared to have been sworn—the nearest approach to these names being William G. Hale, S. B. Austin and Shadrick Hale.

2d. Because the minutes of the Court showed a true bill for murder, found against Henry Bowyer, but none against the prisoner.

3d. Because there was no sufficient minutes and records of the proceedings. of said Court, as to finding of said bill—the only evidence of the signing of said minutes being the name of John H. Lumpkin, signed immediately under the names of Counsel to an agreement, without any entry as to the adjournment of the Court.

Also, a motion for a new trial upon the same grounds and also the following:

1st. Because the Court erred in charging the triors of the Jurors, that if the Juror had formed and expressed an opinion from rumor, he was an incompetent Juror.

2d. Because the Court failed to charge the Jury, that in considering of the admissions of defendant, as given in evidence by the State, it was their duty to consider of the whole admissions; and failed to charge the Jury at all upon this subject, although requested so to do by Counsel for prisoner, when addressing the Jury.

3d. Because there was no evidence upon which the Jury could find prisoner guilty—the only evidence that deceased was killed by prisoner being his own confession, coupled with the express declaration, that he did it in self-defence; and

Bowie vs. The State.

there was no evidence contradicting that declaration or inconsistent with its truth.

4th. Because the Court did not sufficiently charge the Jury upon the nature and certainty of the evidence necessary to convict in criminal cases; the only charge of the Court upon this subject being, that Counsel for prisoner had insisted, in argument, that if they entertained reasonable doubts of defendant's guilt, it was their duty to acquit; that that was the law, but that it must be a reasonable doubt—not a mere conjecture—a bare possibility; that some men even pretended to doubt their existence; that it must not be a doubt of this sort; that he did not know that he could make it plainer than to say, it must be a reasonable doubt.

5th. Because Counsel for defendant offered to prove that deceased, when killed, had run away from Tennessee for some offence, and what that offence was, which was refused by the Court; the Court holding and declaring, that if prisoner's Counsel sought to show deceased a violent and bloodthirsty man, he would confine them to his general character as such.

The following testimony was offered in the case:

JAMES BATES being sworn, said: Some time last April was a year ago, in this county, witness was sent for and went down there; witness, his son and William Morgan. When they got there, deceased was lying some twenty-four steps from prisoner's house, his feet down the hill; and some two hours after he arrived, saw wounds on the back part of his head; after examining, found skull broken; stove in in one place, the only fractured, some of his clothing lying beyond him. It was warm weather; his shoes and stockings were off; it was thirty minutes after one o'clock in daytime. Prisoner was sitting on his porch when witness got there, rather facing towards deceased; prisoner remarked, there lay the man; that he did it, and that he did it in self-defence. Learned from prisoner that his name was Tadlock. At the inquest, the Jury requested prisoner to state how the matter occurred; prisoner said deceased come to his, prisoner's, truck

patch; prisoner requested him to go away, and all that had passed should pass. After some conversation, deceased said he would go where he damned please. Deceased went towards prisoner's house and prisoner followed him; after they got there they had some conversation; deceased pulled out a pistol and told prisoner to shoot him, and that prisoner ought to shoot him; deceased then went in the direction of spring-house. Prisoner heard a pistol fire; prisoner thought deceased had shot at one of his horses in the lot; deceased also fired a pistol in prisoner's house, witness thinks after deceased fired out of doors; witness and others being just over the creek from prisoner's house, heard some three or four reports of pistol shots; there was nothing shot; he was partially behind the spring-house; at first he did not know but that he had killed one of his horses; afterwards, one of prisoner's children was out, and prisoner saw the child fall just as deceased fired; did not know but that the child was shot; but the child got up and was not shot; the pistol found lying by deceased was a revolver; one pistol had been fired in an adjoining room, in prisoner's house. Prisoner stated, that after the shooting he sent for witness and his son. The shooting took place about eleven or twelve o'clock; witness went down. Prisoner's son that had been sent for witness stayed so long, prisoner became uneasy and went in search of him; went to Mr. McBee's house, which is half way between prisoner's house and witness' house; witness lives some half mile. Prisoner said he found his son at Mr. McBee's, and returned home and found deceased lying at spring-house; found an axe which had been had at the washpot and knocked deceased on the head; witness had been introduced to deceased at prisoner's house, some time in November previous.

Witness says he did not know deceased's character for violence; saw no weapon but the pistol, and that was lying out by deceased. Prisoner had stated to witness, when at prisoner's house in November before, that he supposed Tadlock was the father of little Willie the grand-son of prisoner, who was an illegitimate child, and who was at his grand-fathers;

Bowie vs. The State.

.child Willies' mother was then dead; had been drowned a ;a few weeks previous. Prisoner had another daughter, single, grown and another nearly grown. Tadlock came there some six weeks after death of Willie's mother; when they went to deceased, as he lay at the spring, a flask was found lying by him, with some spirits in it; not quite half full; deceased lay from 25 to 28 steps from prisoner's porch; does not think it was exactly in the yard; rather behind the :spring-house, but within the inclosure; prisoner had a large family of children. Mrs. Bowie was a feeble woman, and appeared to be in bad health; prisoner had character of being a peaceable, honest and industrious man.

JOHN SITTON: Deceased's name was Tadlock; had known him three years.

MARY McBEE, sworn: Said prisoner came to Mr. McBee's; prisoner said deceased was drunk and asleep behind his spring-house, and he had come for advice which was given; prisoner said he would kill him, which he repeated several times; witness urged prisoner not to kill him; witness' mother advised tying him if he got unruly, and send for the neighbors. Prisoner said he felt like killing him.

DR. JAMES WORTHINGTON: That deceased died of the wounds; either wound was sufficient to have caused his death; does not know his character for violence; saw pistol lying near deceased. It was the only evidence of deceased carrying weapons.

The Court over-ruled the motion in arrest of judgment and the motion for a new trial, and these decisions are assigned as error.

WRIGHT, for plaintiff in error.

C. PEEPLES, representing Sol. Genl. for defendant.

*By the Court.*—BENNING, J. delivering the opinion.

[1.] The grounds for the motion in arrest of judgment,

consisted of matters which did not affect "the real merits of the offence charged in the indictment." And such grounds are not good in arrest of judgment. (*Code*, 11 *Div.* 2 *Sec.*)

[2.] These same grounds were relied on in the motion for a new trial. But they are of a kind which is not appropriate to a new trial. They are not extrinsic: the matters in which they consist, are not "foreign to or *dehors* the record." (3 *Black. Com.* 387.) It is obvious that such matters as these are, do not lie within the province of the Jury.

Another of the grounds contained in the motion for a new trial was, that the Court charged the triors, that if the Juror had formed and expressed an opinion from rumor, he was incompetent.

But the *bill of exceptions* fails to state what was the charge of the Court to the triors.

In the motion for a new trial, it is assumed that such was the charge; but even in that motion, it is not stated whether the Juror was put upon the triors by the accused or by the State. The charge, if given, was such that it could not operate otherwise than in favor of the party, which was the one objecting to the Juror. If, therefore, it was the accused that was that party, the charge, if wrong, operating as it did in his favor, if it operated at all, was not a thing of which he could take advantage.

[3.] Under these circumstances, it is impossible for this Court to be able to say whether this ground, even if good in law, was one on which a new trial should have been granted by the Court below.

The next of the grounds taken for a new trial was, that the Court failed to make any charge to the Jury, concerning "admissions."

[4.] The mere omission by the Court to give a charge on a particular point, is not, in general, a ground on which a new trial may be demanded. If the point be one about which the law is doubtful, or is abstruse, such an omission is, perhaps, a matter which gives a right to the losing party to call for a new trial. If it be not such a point, why should we

Bowie *vs.* The State.

say that the Jury, a body which, indisputably in criminal ca-
ses, is made the judges of what the law is, did not follow the
law ?  (*Graham on N. Trials,* 273.)

Even the New Trial Act of 1854, does not make the mere
*omission* to give a charge a ground for a new trial.  (*Acts of*
1854, 46–'7.)

And the rule, that in considering a person's admissions, all
of the admissions are to be taken together, is one so obvious,
that a Jury would, of themselves, it is to be presumed, follow
it.

[5.] The next ground taken in the motion for a new trial
was, that there was no evidence on which the Jury could find
the defendant guilty.  But we think there was evidence on
which the Jury could find him guilty.  We think the weight
of the evidence is on the side of the verdict.

The next ground taken in the motion was, that the Court
did not sufficiently charge the Jury, upon the nature and cer-
tainty of the evidence necessary to convict in criminal cases.

We cannot see any error in the charge of the Court on this
point.

The next and last ground was, that the Court had refused
to let the accused prove that the deceased, when killed, was
a fugitive from Tennessee for an offence, and what the offence
was.

No case, as far as we know, has gone the length of deciding,
that evidence of such facts as those, is admissible for the pur-
pose of showing a homicide to have been justifiable.  The
case of *Monroe vs. The State,* (5 *Ga. R.*) certainly has not.
If the crime of which the slayer offers to prove the person
slain to have been guilty, is such that from its very na-
ture it may stand as one among those "circumstances"
which the law considers "sufficient to excite the fears of a
reasonable man," then, perhaps, evidence that the person
slain was guilty of it is admissible ; but in this case, the bill
of exceptions fails to tell us what was the crime of which the
accused offered to prove the deceased to have been guilty.

We, therefore, cannot say that the Court below was wrong

in refusing to let the accused make the proof which he pro-
posed to make.

The result is, that we think the Court below did right in
over-ruling both motions.